**IN THE COURT OF APPEALS OF IOWA**

No. 17-1280
Filed November 21, 2018

**SOUTHERN IOWA BIN BUILDERS, LLC d/b/a SOUTHERN IOWA BIN COMPANY,**
        Plaintiff-Appellee,

**vs.**

**STEVEN JEROME SIEREN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Keokuk County, Lucy J. Gamon
(summary judgment ruling) and Joel D. Yates (trial), Judges.


        Steven Sieren appeals from a judgment entered against him in this suit by
Southern Iowa Bin Builders, LLC to recover payment on a dishonored check.
**AFFIRMED.**


        Billy J. Mallory of Brick Gentry, PC, West Des Moines, for appellant.

        Matthew B. Moore of The Law Offices of Matthew B. Moore, PLLC,
Oskaloosa, for appellee.


        Heard by Danilson, C.J., and Potterfield and Doyle, JJ.

**DANILSON, Chief Judge.**

The district court found in favor of Southern Iowa Bin Builders, LLC (Bin Builders) in this action to recover payment on a dishonored check against Steven Sieren. Sieren appeals, contending the check was not dishonored because Bin Builders first breached a "hold check" agreement by cashing the check without Sieren's approval. He also asserts the court erred in rejecting his counterclaims against Bin Builders for breach of contract, negligent construction, and conversion. Because we give weight to the court's credibility assessments and the trial court's findings are supported by substantial evidence, we affirm.

**I. Background Facts and Proceedings.**

Bin Builders is a single-member limited liability company, and Jason Van Donselaar is its president and sole member. Bin Builders, through Van Donselaar, entered into an oral agreement with Sieren for the installation of two additional grain bins and related other work regarding existing grain bins at Sieren's property known as Sutton Farm. Sieren agreed to Bin Builders's bid of June 5, 2014, which estimated over $180,000 for materials and labor. Sieren's father, Jerome Sieren, gave Bin Builders $98,000 on June 20, 2014, and Bin Builders began its work on the project. Sieren and his father often worked on the Sutton Farm site with Van Donselaar. At Sieren's request, Bin Builders provided additional work and materials not included in the original bid disassembling and re-erecting a bin on Sutton Farm that Sieren had on another property (Blakesburg). In late October, Van Donselaar spoke with Sieren about having to "get settled up, caught up with new material coming in that was paid for by [Bin Builders], that we needed to get

together on that and from that day forward he disappeared. Never seen him again."

Sometime shortly after November 19, 2014, Van Donselaar went to Sieren's shop, but he was not there. Van Donselaar left invoices for work completed and materials Bin Builders had paid for to date, which invoices totaled $164,139.32 with a balance due of $66,139.32. Van Donselaar informed Sieren that Bin Builders was unable to do any further work on the grain bin project unless and until additional payments were made by Sieren to Bin Builders.

Sieren was still harvesting his crop in December 2014. On December 28, Van Donselaar asked Sieren via text message, "Did you get financing figured out with the bank." On January 7, 2015, Sieren responded, "still got 2 meet with banker?" On January 8, Van Donselaar sent a text, "I would like to come down tomorrow to get a check I'm going to be in your neighborhood." At about 7:00 a.m. on January 9, Sieren responded, "What time are u going to be down?"

Van Donselaar arrived at Sieren's home on the morning of January 9 to discuss the need for additional payment from Sieren and moving forward on the project. They discussed the invoices and agreed to some adjustments, after which Sieren gave Bin Builders a signed and dated check for $58,057. However, Sieren informed Bin Builders not to cash the check until later, and Van Donselaar agreed to do so.

On January 13, Van Donselaar sent a text, "I'm going to the bank today can I run that check through." Sieren sent a text, "I have appoint at 2pm today with banker?"

At 8:23 a.m. on January 15, Van Donselaar sent a text to Sieren, "On my way." Van Donselaar went to the bank and, after consulting with a banker who checked to see if there were sufficient funds in Sieren's account, Van Donselaar deposited the January 9th check. At 10:44 a.m., Sieren sent at text to Van Donselaar, "What is ur 20." Van Donselaar responded, "I was there a couple hours ago you need the clamps for the back side. The are typically wire to the flighting but i did t see them do you know where they are at."

On January 21, 2015, Sieren stopped payment on the check. He did not inform Bin Builders.

On January 23, Van Donselaar was informed by his bank that he was overdrawn by $40,000 and that payment had been stopped on Sieren's check. On January 27, Van Donselaar sent Sieren two texts, "Do you have the money yet?" And, "I need to go too ottumwa today or tomorrow just wondering if we meet up then to get this taken care of." On Monday, February 2, he sent Sieren two more texts, "Is it going to work this morning" and "Even just 24-25K for today to cover me." Sieren responded, "will be thursday before i can get some money?"

On Thursday February 5, Van Donselaar sent these texts: "Tomorrow morning work for you too get together for a check." An hour later, "What time works for you." Sieren responded, "Didn't get my corn hauled? Sorry no money?"[1]

Bin Builders filed suit against Sieren for the dishonored check. After a two-day trial to the district court, the court concluded "there is no question that the check in the amount of $58,057.00 is a fully integrated written contract" and that,

---

[1] Exhibits N and O include receipts from ADM Grain Company for delivery of corn by Sieren on January 16, 19, 22, 28, 30, and February 3, 2015.

even accepting a "hold-check" agreement, Bin Builders "acted reasonably and did not violate any hold-check agreement." The court found:

> [Bin Builders] waited four days and reached out via text message to [Sieren] as to whether [Bin Builders] could now cash the check. [Sieren] not only did not reply to the text message, but has provided no rationale as to why he did not respond. [Bin Builders] then waited two extra days and received both the advice of his banker and verification that there were adequate funds in the account prior to cashing said check. Additionally, a critical factor in this analysis is that the bulk of the money in question had to do with services already performed. [Sieren] cannot claim that if he never spoke to [Bin Builders] again, then [Bin Builders] had no right or authority at any time to cash the check in question. [Sieren] wanted to sleep on it, and he did. [Bin Builders] was able to verify that [Sieren] did, in fact, have the monies to cover the check.
>
> [Bin Builders] waited six days prior to cashing the check. [Sieren]'s hold-check agreement contained no definite end date. Again, the check in question was for invoices for work that had already been performed by [Bin Builders] and not solely for work to be performed in the future. It would make no sense to require [Bin Builders] to wait a lengthy and/or indefinite period of time before cashing the check for work which had already been performed. Again, [Bin Builders] did attempt to "speak" with [Sieren] and [Sieren], of his own volition, failed to respond. Not only do we have an integrated written contract, but the court also concludes that [Bin Builders] did not breach any hold-check agreement.
>
> [Sieren] now claims that [Bin Builders]'s actions damaged him and he is entitled to an offset. It is accurate to say that [Sieren]'s claims of damages changed, evolved, and were modified over the course of this case. [Sieren]'s credibility took a major hit when he acknowledged on cross-examination that his damage claims for electricity were, in fact, frivolous. This is just one example of [Sieren] lacking credible evidence on his claim for damages. Simply stated, [Sieren] failed to meet his burden of proof as to damages caused by [Bin Builders], and the court also notes that [Sieren] failed to present any type of expert testimony or any testimony other than his own which would verify his alleged damages.

Judgement was entered in favor of Bin Builders in the amount of the check plus interest and $12,000 for attorney fees.

Sieren now appeals.  He does not challenge the law applied by the district court.[2]  But, he does challenge the court's findings and its application of law to the facts.

## II. Scope and Standard of Review.

Our review is for correction of errors of law.  Iowa R. App. P. 6.907.  "We are bound by the trial court's findings of fact so long as they are supported by substantial evidence."  *Smith v. State*, 845 N.W.2d 51, 54 (Iowa 2014).  "We consider evidence as substantial if a reasonable person would accept the evidence as adequate to reach the district court's conclusion."  *Id.* (citation omitted).

## III. Discussion.

***A. Agreements.***    The parties initially had agreements through bids submitted by Bin Builders and accepted by Sieren.  Additional work, which was not identified in the bids, was also added to the plans.  Subsequently, a dispute arose.  Bin Builders sent an invoice but was not paid, and Sieren disputed some line items in the invoice.  The parties ultimately reached a mutual agreement on January 9, 2015, to resolve their dispute requiring Sieren to pay $58,057 in lieu of the invoiced amount of $66,139.52.  However, the check issued by Sieren was dishonored by the bank.[3]

---

[2] On appeal, Sieren complains Bin Builders has failed to cite authorities in its appellate brief.  However, it is Sieren's burden to establish that the decision on appeal is erroneous.  Even where an appellee files no brief, the appellant is not automatically entitled to prevail.  We "handle the matter in a manner most consonant with justice and [our] own convenience."  *Bowen v. Kaplan*, 237 N.W.2d 799, 801 (Iowa 1976); *see also State ex rel. Buechler v. Vinsand*, 318 N.W.2d 208, 209 (Iowa 1982).

[3] Neither party has described their compromise as a substituted agreement or as an accord and satisfaction.  Accordingly, we will review the case without attempting to delineate the compromise agreement.

***B. Dishonored check****.* Sieren acknowledges that the Iowa Uniform Commercial Code Article 3 governs an action for a dishonored check. *See* Iowa Code §§ 554.3101–.3605, 625.22 (2015). Section 554.3104 provides:

> (1) Except as provided in subsections 3 and 4, "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
> (a) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
> (b) is payable on demand or at a definite time; and
> (c) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain an undertaking or power to give, maintain, or protect collateral to secure payment, an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or a waiver of the benefit of any law intended for the advantage or protection of an obligor.
> (2) "Instrument" means a negotiable instrument.
> (3) An order that meets all of the requirements of subsection 1, except paragraph "a", and otherwise falls within the definition of "check" in subsection 6 is a negotiable instrument and a check.
> . . . .
> (6) "Check" means a draft, other than a documentary draft, payable on demand and drawn on a bank or a cashier's check or teller's check. An instrument may be a check even though it is described on its face by another term, such as "money order".

Section 554.3113(1) provides, "An instrument may be antedated or postdated. The date stated determines the time of payment if the instrument is payable at a fixed period after date." A check is "payable on demand" if it "does not state any time of payment." Iowa Code § 554.3108(1). The January 9, 2015 check indicates no condition on its face.[4]

---

[4] We agree with Sieren's arguments the check was not a fully-integrated agreement. *See In re of Estate of Chiodo*, 333 N.W.2d 241, 242 (Mich. Ct. App. 1983) (concluding even adding the word "labor" on a check does not transform "the check from an ordinary negotiable instrument"). "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." *Fausel v. JRJ Enters., Inc.*, 603

According to section 554.3502(1)(a), "If the note is payable on demand, the note is dishonored if presentment is duly made to the maker and the note is not paid on the day of presentment."[5]

Here, on January 9, 2015, Sieren provided a signed and dated check to Bin Builders in the amount of $58,057. Pursuant to section 554.3113(1) then, the check was payable on January 9, 2015, as that is the "date stated" on the check— unless Sieren can prove his defense grounded upon section 554.3117, which provides:

> Subject to applicable law regarding exclusion of proof of contemporaneous or previous agreements, the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement. To the extent an obligation is . . . supplemented . . . by an agreement under this section, the agreement is a defense to the obligation.

*C. Supplemental agreement.* Both parties agree there was a supplemental oral agreement that Van Donselaar would not cash the check immediately. However, they dispute the nature and extent of the condition upon which the check could be cashed. The factual dispute was for the district court to determine. *See Fausel*, 603 N.W.2d at 618 ("[W]hen the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact unless 'the evidence is so clear that no reasonable person would determine the issue in any way but one.'" (quoting Restatement (Second) of Contracts § 212 cmt. e (1979)).

---

N.W.2d 612, 618 (Iowa 1999) (quoting Restatement (Second) of Contracts § 209(1)). Accordingly, the court properly received evidence of any supplemental agreement pursuant to Iowa Code section 554.3117.

[5] "Presentment" is defined in section 554.3501.

Bin Builders maintains the "only contingency in the parties' oral contract . . . was [Bin Builders] would hold the check until [Sieren] had sufficient funds in his account to cover the check." Sieren, on the other hand, asserts that the check was to be held until he informed Bin Builders to proceed—potentially indefinitely. We agree with the district court that Sieren's position is unreasonable and untenable.

Van Donselaar testified:

> Q. On January 9 you were negotiating what was due on what had been done in the past; correct? A. We were going through invoices 1411 through 1416.
> Q. And as of that date you had been paid $98,000? A. I had.
> Q. Okay. And in order to go to the future, Steve was going to work on getting financing if he was to do it; correct? A. He had to sell corn and get financing, yes.
> Q. Okay. And so when he gave you Exhibit 11 [the January 9 check]. . . .
> Q. Mr. Sieren told you when he gave you Exhibit 11, "Do not cash that check until we talk further"; correct? A. The discussion was he had to get financing, the money available. He told me to hold the check until money was available.
> Q. Okay. In addition to that, did he tell you, "Do not cash that check until we talk further"? A. It was to—Exactly because—until some money was available.
> Q. Well, he told you until—you weren't to cash it until you talked with him again; correct? A. Correct.

Although Bin Builders was not to cash the check until Sieren informed it to do so, we view this as simply a method to inform Bin Builders that sufficient funds were in the account. We find it incredible to believe, as did the district court, that the terms of the supplemental agreement prevented Bin Builders from cashing the check when the funds were available—simply because Sieren had not yet informed Bin Builders. There would be little purpose in accepting a check when it could only be cashed at the whim of the issuer.

Bin Builders's position is supported by the inferences arising from the text messages between Van Donselaar and Sieren. On January 7, Sieren stated he had to "meet the banker." He gave the check to Van Donselaar on January 9 and then on January 13 indicated he had an appointment with the banker at 2:00 p.m.

Sieren's testimony was also inconsistent and lacked credibility. He claimed that the check was not to be cashed until he informed Bin Builders it could be cashed, that he had to get financing from the bank, that he was waiting for corn money to come in, that the check should not be cashed because he wanted to sleep on it, and because he wasn't sure about it.

Sieren objects to the court's finding that "[t]he bulk of this check represented work already performed by [Bin Builders]." Sieren notes the testimony at trial established that the $58,057 check was based on six invoices, invoices 1411, 1412, 1413, 1414, 1415, and 1416. He acknowledges invoices 1411 through 1415 total $137,352.52. He disputes line items of those invoices; but at the very least, Sieren acknowledges past work was done in accordance with an oral agreement to install grain bins and related materials.

We observe invoices 1413 and 1414 (totaling $44,588.50) involve materials and labor related to moving and reassembling a grain bin from its existing foundation on Sutton Farm to a newly poured foundation—which work was *not* included in the original bid. Sieren thus concedes this additional work was done.

Sieren asserts invoice 1416 "represented future work to complete the project if the project was approved to move forward." There is no labor included on invoice 1416. Rather, Van Donselaar testified invoice 1416 reflects "the material for the pit, the tower, and the drag conveyor and the elevator leg" already

purchased by Bin Builders in accordance with the project as bid in June 2014.[6] Van Donselaar testified the items still in Bin Builders's possession for the project,[7] some of which were manufactured specifically for this project, were of little value to others, estimating the most he would be able to sell the items for was $1800.

Both Van Donselaar and his coworker, Brian John Van Der Wal, testified that when Bin Builders ceased working on Sieren's project in November 2014 the bins were ready for corn storage.[8] There is substantial evidence supporting the trial court's finding that the "bulk of the money in question had to do with services already performed."

As noted above in section I, the invoices provided to Sieren totaled $164,139.32 with a balance remaining of $66,139.32. The parties agreed to adjustments to the invoices and agreed Sieren would pay $58,057. Sieren signed and dated a check in that amount but later stopped payment. We affirm the trial court's judgment for the dishonored check.[9]

***D. Counterclaims.*** Sieren next argues the trial court erred in ruling against him on his claims of breach of contract and negligence. The trial court found Sieren and his claims lacked credibility. "Determinations of credibility are in most instances left for the trier of fact, who is in a better position to evaluate it." *State v.*

---

[6] The labor and additional items that would need to be purchased to complete the project were provided by Van Donselaar to Sieren in an additional bid of $34,919. But the project did not proceed and Bin Builders did no more work.

[7] Van Donselaar testified he had "portions" of the MDL 30 painted York leg (but the "expensive parts are down at Steve's"), "some trunking and the belt," a $1300 Baldor motor, a portion of the pit drag conveyor (but "the head and the hopper is at his place"), and the pit drag motor purchased for $1050.

[8] Electricity still needed to be hooked up, but Bin Builders does not do electrical work.

[9] Sieren challenges the award of attorney fees arguing only that the check was not dishonored. Having rejected his challenge, we uphold the attorney fee award. *See* Iowa Code § 625.22 (allowing attorney fees in successful action for dishonored check).

*Weaver*, 608 N.W.2d 797, 804 (Iowa 2000). In this jury-waived case, the trier of fact was the trial court. We defer to the court's assessment of Sieren's credibility here and affirm the rejection of his counterclaims.

    **AFFIRMED.**